MADELEINE M. LANDRIEU, Judge.
|! This appeal arises from a dispute between the plaintiffs, Herbert C. Wellman, Jr. and Craig E. Collier (‘Wellman/Col-lier”), and the defendant, Mr. Mohammad Tufail, over the sale of stock of a corporation. The principal asset of the corporation was a lease of commercial property on Decatur Street in the French Quarter, out of which the corporation operated a specialty food store. The lessor/landlord of the Decatur Street property was the French Market Corporation (“FMC”); the lessee/tenant was the corporation, Cookery N’Orleans Style, Ltd. (“Cookery”).
Soon after the sale of the stock from Mr. Wellman/Mr. Collier to Mr. Tufail, the FMC alleged that the sale was a violation of the lease agreement between it and Cookery. This litigation between Mr. Wellman/ Mr. Collier and Mr. Tufail ensued.[1]
The current appeal arises from two separate judgments: The first judgment was rendered on February 6, 2012 after the trial court heard several motions, two |2of which were motions for summary judgment. The trial court designated this judgment as final pursuant to Louisiana Code of Civil Procedure article 1915(B). The second judgment was rendered on May 21, 2012 after a trial on the issue of damages. Mr. Wellman and Mr. Collier now appeal both judgments. For the reasons that follow, we find that there are no material facts in dispute. After a de novo review of the record, we reverse both judgments of the trial court.
FACTS AND PROCEEDINGS BELOW
Cookery was incorporated in 1977. At that time, it entered into a lease agreement with the FMC, an entity created by the New Orleans City Council to manage and administer the city-owned French Market. The lease agreement was for property located at 812 Decatur Street. This 1977 lease expired, and Cookery as Tenant and the FMC as Landlord entered into a second Amended and Restated Lease Agreement in 1997 for the same property, out of which Cookery continued to operate its store.
*53 Two years after the 1997 lease became effective, the day-to-day manager of the store, Mrs. Elaine Collier, decided to retire. Mr. Wellman/Mr. Collier advertised for a new manager of the store, and Mr. Tufail responded.
In April of 1999, Mr. Wellman/Mr. Collier and Mr. Tufail negotiated and executed a document entitled “Management Agreement with Agreement to Purchase Stock Between Cookery N’Orleans Style, Ltd., Owner/Lessee and Mohammad Tu-fail, Manager” (“Management Agreement”). The Management Agreement, executed in the office of Mr. Tufail’s lawyer, was signed by all parties and witnessed by their attorneys. It included the parties’ agreement that Mr. |sTufail, in addition to managing the store, would purchase all the corporate stock of Cookery.
Prior to executing the Management Agreement, Mr. Wellman/Mr. Collier provided Mr. Tufail with copies of the 1977 and 1997 leases. Understanding the lease to be the principal asset of the corporation, Mr. Tufail hired counsel to discuss the proposed Management Agreement with the lessor, the FMC. After doing so, Mr. Tufail’s counsel, David Oestricher, advised Mr. Tufail that the FMC believed the lease prohibited the proposed Management Agreement. According to stipulated facts, the FMC advised Mr. Tufail that it would approve the Management Agreement between him and Mr. Wellman/Mr. Collier only if the agreement accorded the FMC the right to renegotiate the lease. Neither Mr. Tufail nor Mr. Wellman/Mr. Collier were willing to allow the FMC to renegotiate the lease, each believing that a renegotiated lease would be on terms less favorable to Cookery.
Mr. Tufail then retained new counsel, Mr. David Maraldo, who advised Mr. Tu-fail that, in his legal opinion, neither the proposed Management Agreement nor the proposed sale of the stock was prohibited by the lease. Satisfied with this advice, Mr. Tufail entered into the Management Agreement and proceeded with the stock purchase.
The Management Agreement, negotiated and prepared by Mr. Tufail’s counsel, provided that the principal object of the agreement was the management of the retail business operated by the corporation pursuant to the 1997 lease. The parties agreed on a purchase price of $215,000, payable by Mr. Tufail in the form of $100,000 cash plus a promissory note in favor of Mr. Wellman/Mr. Collier for the remainder. It was clearly understood between the parties that the lease was the |4primary asset of the corporation, with the corporeal assets of the business (merchandise and inventory) being valued at approximately $25,000.
An essential consideration in the negotiations between Mr. Wellman/Mr. Collier and Mr. Tufail was security for the promissory note. To that end, Mr. Tufail proposed and Mr. Wellman/Mr. Collier accepted a pledge of the stock of the corporation as security. Thus, the Management Agreement provided that in the event Mr. Tufail defaulted on the note, the stock of Cookery would revert to Mr. Wellman and Mr. Collier.
Finally, the Management Agreement provided: that a termination of the lease •without payment of the promissory note would be a breach of the agreement; that the removal of any property within the leased premises would be considered “an act of bad faith and immediate default without cure ... ”; and, that Mr. Tufail had an obligation to notify Mr. Well-man/Mr. Collier of any notice of default of the lease by the landlord. In the event of notice of default, the Management Agreement granted Mr. Wellman/ Mr. Collier *54 the right to “cure for the corporation” any-alleged default.
The Management Agreement was executed on April 30, 1999 and became effective that day. Pursuant to its terms, Mr. Tufail immediately deposited $100,000, the cash portion of the purchase price, into his lawyer’s trust account. As a condition of the sale going through, Mr. Tufail’s attorney demanded that the lease between the FMC and Cookery be amended to correct an apparently inadvertent error in the corporate name of the lessee, Cookery. After the lease was so amended, Mr. Wellman and Mr. Collier transferred the stock certificates to Mr. Tufail, and Mr. Tufail authorized his attorney to tender to them the $100,000 he had been holding in escrow. Mr. Tufail then began paying the monthly | ¿installments on the promissory note as provided for in the Management Agreement.
Mr. Tufail paid on the note beginning in June of 1999 and continued paying through August of 2000. Even though the promissory note was a personal obligation of Mr. Tufail’s, each monthly installment was paid by check from the account of Cookery N’Orleans Style, Inc., with the last of the payments being made on August 1, 2000. The September installment was paid late and returned by Mr. Wellman/Mr. Collier. Prior to August, a few other payments had been made late, and Mr. Tufail had missed a few payments, as well. For instance, a check dated January 2000 had been returned by the bank for non-sufficient funds.
Following the receipt of the January, 2000 NSF check, Mr. Wellman and Mr. Collier, through their attorney, had sent a letter to Mr. Tufail advising him that they would no longer accept late payments on the promissory note and would pursue their rights on the note in the event future payments were not made in accordance with its terms.
By this time, the FMC, having learned about the existence of the Management Agreement, had notified Cookery that it was in default of its lease. In a letter to its lessee in November, 1999, the FMC gave notice that the sale of Cookery stock to Mr. Tufail had violated a particular provision of the lease, which the FMC believed prohibited Mr. Wellman/Mr. Collier from assigning and subletting Cookery’s rights in the lease. Mr. Wellman, Mr. Collier, and Mr. Tufail’s attorney all disagreed with the FMC’s interpretation of this provision of the lease.
IfiA. The Declaratory Judgment Action in Orleans Parish
As the Management Agreement granted to Mr. Wellman/Mr. Collier the right “to cure for the corporation” any default on the note, they filed a declaratory judgment action against the FMC in Civil District Court seeking to have the dispute over the lease properly adjudicated. That filing commenced this long and unconventional litigation.
Initially, Mr. Tufail agreed to join Mr. Wellman and Mr. Collier as a plaintiff in this litigation. However, he later decided to take a different approach. Notwithstanding the provisions in the Management Agreement between him and Mr. Wellman/Mr. Collier, Mr. Tufail entered into negotiations with the FMC that resulted in Mr. Tufail forming a new corporation, New Orleans Cooking, L.L.C., to which Mr. Tufail transferred all of the assets of Cookery. He then cancelled the lease between Cookery and the FMC and executed a new lease with the FMC in favor of the new company. On April 3, 2000, Mr. Tufail wrote a letter to the FMC in which he advised the FMC that Cookery “will have no ownership interests in either *55 the lease or the trade name to operate the business.”
In a letter of August 31, 2000, addressed to “Mr. Mohammad Tufail, Cookery N’Orleans Style,” the Executive Director of the FMC advised Mr. Tufail that the “Board of Directors terminated the lease agreement of 812 Decatur Street effective August 30th and agreed to enter into a new lease with [Mr. Tufail’s new corporation] New, Orleans Cooking, L.L.C.” This new lease was for the same property and permitted the sale of essentially the same products. The new lease was signed on September 20, 2000, with an effective date of September 1, 2000.
Apparently because Mr. Tufail had not joined Mr. Wellman and Mr. Collier in the declaratory judgment action in Civil District Court seeking adjudication of |7the lease, the FMC filed an exception of no cause of action. By the time this exception came for hearing, the FMC had withdrawn its notice of default on the lease, had terminated its lease with Cookery, and had entered into a new lease for the same property with Mr. Tufail’s new corporation. Because the lease was no longer in effect, the trial court granted the exception of no cause of action and dismissed the suit with prejudice. No appeal was taken from the judgment granting the exception of no cause of action.

B. The Actions on the Note and for Breach of Contract in Jefferson Parish

In September of 2000, Mr. Wellman/Mr. Collier filed suit against Mr. Tufail in the Twenty-Fourth Judicial District Court for the Parish of Jefferson, Mr. Tufail’s domicile, alleging that Mr. Tufail had defaulted on the promissory note. Mr. Tufail answered, asserting that he had paid the September payment and that it had been returned to him. He further contended that Mr. Wellman/Mr. Collier’s acceptance of late payments in the past had reformed the terms of the note.[2] In October of 2000, Mr. Tufail filed an amended answer in which he alleged that Mr. Wellman and Mr. Collier had known that the sale of their stock to him was a violation of the lease and that they had knowingly sold him a non-existent right.
Mr. Wellman/Mr. Collier then filed a second suit against Mr. Tufail and Cookery, seeking a temporary restraining order; a preliminary and permanent injunction; a declaratory judgment as to the terms of the new lease agreement between the FMC and Mr. Tufail’s new business entity, called “N.O. Style Cooking;” and money damages for breach of the Management Agreement due to |sMr. Tufail’s cancellation of the lease before the note was paid. These two Jefferson Parish suits were consolidated.
In the consolidated action, Mr. Tufail brought an exception of failure to join the FMC as a party. The trial court denied the exception and conducted a full trial on the merits on the claims between these parties.
After trial on the merits, the trial court rendered judgment in favor of Mr. Well-man/Mr. Collier, finding Mr. Tufail in default on the promissory note and ordering him to immediately pay the balance of the note, plus interest and attorney fees, failing which the plaintiffs would have the right to immediately seize the assets of the business. The judgment also held that the transfer of the management and ownership of Cookery from Mr. Wellman/Mr. Collier to Mr. Tufail was not a violation of the original lease between the FMC and Cook *56 ery. Finally, the trial court held that the second lease between N.O. Style Cooking and the FMC was null and void, and that whatever rights N.O. Style Cooking may have had in that new lease were now the property of Cookery. Mr. Tufail appealed that judgment to the Court of Appeal for the Fifth Circuit.
The Fifth Circuit vacated the judgment of the trial court, not on the merits, but on the ground that the trial court had erred by denying the defendants’ peremptory exception of nonjoinder of a party. The Fifth Circuit found that the FMC was “a party in interest” to the action pursuant to articles 641 and 642 of the Code of Civil Procedure. The appellate court therefore sustained the exception, vacated the judgment of the trial court, and remanded the matter for further proceedings.
|9On remand, after the FMC had been joined, the trial court granted the FMC’s exception of improper venue and transferred the case to the Civil District Court.

C. The Consolidated Actions After Transfer to Civil District Court

In Civil District Court, Mr. Tufail filed a reconventional demand against Mr. Well-man/Mr. Collier alleging breach of the Management Agreement, rescission, unfair trade practices and fraud. In 2012, the parties filed the cross-motions for summary judgment that form the basis of this appeal.
On February 6, 2012, the district court denied the motion for summary judgment filed by Mr. Wellman/Mr. Collier on the note and granted the motion for summary judgment filed by Mr. Tufail on his recon-ventional demand. As stated previously, the district court designated this judgment as final.[3] Mr. Wellman/Mr. Collier timely moved for an appeal of this judgment. In the Order of Appeal, dated March 28, 2012, the trial court ordered that the proceedings not be stayed pending appeal.
Thereafter, beginning on April 11, 2012, the district court conducted a trial on damages. On May 21, 2012, the court rendered judgment in favor of Mr. Tufail, finding that Mr. Wellman/Mr. Collier had committed fraud because they knew or should have known that the sale of the Cookery stock would violate the lease. The court awarded Mr. Tufail damages in the following amounts: $98,665.13 for the cash down payment for the rescinded sale; $3,200.00 ■ for money garnished by Mr. Wellman/Mr. Collier from Mr. Tufail’s personal account at Whitney Bank; $7,732.43 for money garnished by Mr. Wellman/Mr. Collier from |inMr. Tufail’s personal account at First Bank; and $31,500.00 for attorney’s fees. The trial court additionally held that Mr. Tufail was not entitled to a return of the $18,000.00 he had paid on the promissory note because these payments had been made from the account of Cookery rather than from his personal funds. For the same reason, the trial court denied Mr. Tufail’s claim for damages allegedly caused by Mr. Wellman/Mr. Collier’s seizure of assets of the corporation pursuant to a writ of sequestration.
On June 12, 2012, Mr. Wellman/Mr. Collier obtained an Order of Appeal of the May 21, 2012 judgment. We now consider the appeals of the February 6, 2012 and the May 21, 2012 judgments together.[4]
*57 ISSUES
The issues raised by the parties are summarized as follows:
I. Whether the trial court erred in denying Wellman/Collier’s motion for summary judgment on the promissory note.
II. Whether the trial court erred in granting Mr. Tufail’s motion for summary judgment on his recon-ventional demand.
III. Whether the trial court erred by awarding damages to Mr. Tufail on his reconventional demand.
IV. Whether the trial court erred by refusing to order Mr. Tufail to pay the costs to the Clerk of Court of the 24th JDC to transfer the record.
[^STANDARD OF REVIEW
We review summary judgments de novo, using the same criteria that govern the trial court’s consideration of whether summary judgment is appropriate. Duncan v. U.S.A.A. Ins. Co., 2006-36S, p. 3 (La.11/29/06), 950 So.2d 544, 547. That is, we must determine whether there are any genuine issues of material fact and, if not, whether the mover is entitled to summary judgment as a matter of law. La. C.C.P. art. 966(C); Cressionnie v. Liberty Mutual Ins. Co., 98-0534, p. 3 (La.App. 4 Cir. 4/8/98), 711 So.2d 364, 366. Generally, material facts are those that potentially ensure or preclude recovery, affect the litigant’s ultimate success, or determine the outcome of a legal dispute. Safeway Ins. Co. of Louisiana v. Premier Automotive Superstore, 2009-0074, pp. 2-3 (La.App. 4 Cir. 5/27/09), 13 So.3d 236, 238. Despite the legislative mandate that summary judgments are favored, factual inferences reasonably drawn from the evidence must be construed in favor of the party opposing the motion, and all doubt must be resolved in the opponent’s favor. Willis v. Medders, 2000-2507, p. 2 (La.12/8/00), 775 So.2d 1049, 1050. A summary judgment may be rendered dispositive of a particular issue even though it does not dispose of the entire case. La. C.C.P. art. 966(E).
DISCUSSION

Issues I and II: Motions for Summary Judgment

We first address the denial of Mr. Well-man/Mr. Collier’s motion for summary judgment on the note and the granting of Mr. Tufail’s cross motion for summary judgment on his reconventional demand.
The motion for summary judgment filed by Mr. Wellman/Mr. Collier alleged that Mr. Tufail failed to pay the September 1, 2000 installment due on the promissory note and that, as holders of the note, they had the option to render the |12entire balance due and payable. Given the evidence presented in support of this motion and the undisputed facts discussed herein, we find that the trial court erred as a matter of law when it denied this motion for summary judgment.
In support of their motion for summary judgment, Mr. Wellman/Mr. Collier offered and the court accepted, without objection, the following exhibits into evidence: The Management Agreement and Agreement to Sell Stock; the promissory *58 note; certain documents transferring the Cookery stock from Mr. Wellman/Mr. Collier to Mr. Tufail; the sworn testimony of Mr. Tufail admitting that the last payment he made on the promissory note was the August 2000 payment; copies of checks for thirteen payments (six of which were paid late or returned NSF); a January 26, 2000 letter making demand for the January 2000 payment and putting Mr. Tufail on notice that Mr. Wellman/Mr. Collier would consider future late payments a default of the Agreement; Stipulated Facts signed by counsel for both parties; a December 3, 1999 letter from David Maraldo to Mr. Tufail outlining his representation of Mr. Tufail and the basis for his legal advice that the sale of the corporate stock by Mr. Wellman/Mr. Collier to Mr. Tufail was not a breach of the lease with the FMC; the 1977 lease between Cookery and the FMC; the 1997 lease between the same parties; and affidavits of Mr. Collier and Mr. Well-man attesting that they had not received payment on the promissory note from September 2000 to date. This evidence set forth a prima facie case for judgment on the promissory note.
Accordingly, the burden shifted to Mr. Tufail to provide specific facts showing that there was a genuine issue for trial. See La. C.C.P. art. 967(B). To this end, Mr. Tufail asserted that the sale of the stock and the promissory note securing that sale were a part of the same transaction and could not be separated. 11sHe did not deny that he had failed to pay the promissory note or that he had terminated the lease between Cookery and the FMC. He claimed, however, that Mr. Wellman and Mr. Collier did not have the authority to sell to him their rights in the lease in the first place. Thus, he argued, he had not received any consideration for his promissory note. Essentially, Mr. Tufail argued before the trial court and now contends on appeal that the “cause” of both the promissory note and the Management Agreement was the lease, without which he would not have purchased the stock of Cookery. Therefore, since the FMC refused to honor the lease once Mr. Tufail became the owner of the stock, he had a right to rescind the sale and to vitiate the note and the Management Agreement on grounds of error and fraud. This same argument was the basis for Mr. Tufail’s cross motion for summary judgment on his reconventional demand.
In support of his argument, Mr. Tufail introduced the same documents introduced by Mr. Wellman/Mr. Collier, plus a few additional exhibits, namely: excerpts of the deposition of Stephen Hand (the executive director of the FMC at the time of the 1999 and 2000 leases); the notice of default sent by the FMC to Cookery; the September 1, 2000 lease between the FMC and N.O. Style Cooking; and Mr. Tufail’s own affidavit. This is the same evidence Mr. Tufail submitted to the trial court in connection with his cross motion for summary judgment.
We find that this evidence fails to establish a material issue of fact sufficient to defeat summary judgment on the promissory note and also fails to establish Mr. Tufail’s right to summary judgment on his reconventional demand. We note that Mr. Tufail was personally obligated on the promissory note, but all of the payments made on the note were drawn on the account of Cookery. When Mr. Tufail incorporated New Orleans Cooking, L.L.C. and began to operate the l14business as New Orleans Style Cooking, he transferred to it all the inventory of Cookery to the new company without compensating Cookery in any way. Had Mr. Tufail met his entire obligation on the promissory note, the debt would have been extinguished, and Mr. Wellman/Mr. Collier would have had no right to complain about the transfer of *59 assets to a new corporation. However, the Management Agreement provided that the stock of Cookery was the security for the note and that the stock would revert to Mr. Wellman/Mr. Collier in the event of default. Therefore, by taking the assets from Cookery and placing them in another corporation, Mr. Tufail eliminated the security for the note.
The parties stipulated that Mr. Tufail made payments on the promissory note for thirteen months, paying late on a few occasions and missing a few payments. It is also undisputed that Mr. Tufail failed to make timely payments after August 2000;[5] that he then terminated the lease between Cookery and the FMC; and that he transferred the assets of Cookery to a new corporation formed by him.
Because the Management Agreement provided that the stock of Cookery was the security for the note, when Mr. Tufail began depleting the assets of Cookery without having satisfied the note, he not only defaulted on the note, but also breached the Management Agreement. The Management Agreement further provided that terminating the lease prior to payment of the note in full, as Mr. Tufail did, would constitute a breach of the agreement. Accordingly, we find no genuine issue of material fact and conclude as a matter of law that Mr. Tufail defaulted on his obligation under the promissory note and violated the Management Agreement between himself and Mr. Wellman/Mr. Collier. | ^Therefore, the trial court erred by denying Mr. Wellman/Mr. Collier’s motion for summary judgment.
With regard to Mr. Tufail’s motion for partial summary judgment, we note that the parties clearly agreed that the principal asset of the business was the lease and that only $25,000 of the $215,000 purchase price covered the inventory and equipment. There is no dispute, therefore, that the “cause” of both the promissory note and the Management Agreement was the lease. Mr. Tufail thus argues that his consent to the Management Agreement was obtained through fraud or error because he did not know that the FMC would refuse to honor the lease, implying that Mr. Wellman/Mr. Collier deliberately concealed this fact from him.[6] This argument is without merit.
Fraud is “a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other.” La. C.C. art. 1953. Fraud may result from silence or inaction. Id. Fraud does not vitiate consent when the party against whom the fraud was directed could have ascertained the truth without difficulty, inconvenience, or special skill. La. C.C. art. 1954.
Mr. Tufail makes two general allegations of fraud that warrant our consideration. The first concerns an affidavit Mr. Collier gave to the FMC to facilitate the correction of the corporate name of Cookery as it appeared in the 1997 lease prior to the sale of the stock.[7] In that affidavit, Mr. Collier *60 attested that |1fiCookery N’Orleans Style, Ltd. was the original tenant in 1977 and remained the tenant in 1997. He further attested that Cookery “had not changed ownership or management from the time the lease was executed until the date of the affidavit.” The affidavit was signed by Mr. Collier on May 19,1999.
Mr. Tufail alleges that this affidavit constituted an act of fraud because it misrepresented the truth to the FMC. His argument is without merit for two reasons. First, Mr. Collier’s affidavit is not false. Effective May 1, 1999, Mr. Tufail became the manager of the store, and he was in the process of purchasing the Cookery stock. Mr. Tufail confuses Cookery, the corporation, with Cookery, the store. At the time Mr. Collier executed the affidavit, Mr. Tufail was managing the store, but he had not yet purchased the corporate stock and had no management responsibilities over the corporation. The store had many managers over the years, Mrs. Collier being the last of these before Mr. Tufail. However, the ownership and management of the corporation did not change between the time the 1997 lease was executed and the time the affidavit was sworn. Second, this affidavit was prepared by Mr. Collier to satisfy a provision of the Management Agreement insisted upon by counsel for Mr. Tufail as a condition precedent to the sale of stock. Therefore, Mr. Tufail was well aware of the purpose and intent of the affidavit. To suggest that this affidavit establishes fraud is frivolous.
117The second allegation warranting discussion is Mr. Tufail’s claim that Mr. Well-man/Mr. Collier knowingly sold him a nonexistent right. That is, they sold him their rights in the lease when they knew that such a sale violated their lease with FMC. This claim is equally frivolous. The undisputed facts are that Mr. Tufail was provided a copy of both the 1977 and 1997 leases, consulted and/or retained two lawyers in connection with the stock transaction, and was aware of the FMC’s position before entering into the Management Agreement. He knew exactly what Mr. Wellman/Mr. Collier knew. This is not evidence of fraud.
Mr. Tufail alternatively argues his consent is negated by error. Error vitiates consent only when it concerns a cause without which the obligation would not have been incurred and that cause was known or should have been known to the other party. La. C.C. art. 1949. In the event of error, a contract can be rescinded. We find that there was no error sufficient to rescind the contract between these parties.
As addressed previously, there is no question that the “cause” of the sale of the stock was the ability to operate the ongoing business pursuant to the lease between Cookery and the FMC. As will be further explained, the Management Agreement did not violate the 1997 lease between Cookery and the FMC. Mr. Tufail violated the Man *61 agement Agreement by allowing the cancellation of the lease prior to his having paid the note in full, by transferring the assets of Cookery to New Orleans Cooking, L.L.C., and by entering into a new lease for the same space without any compensation to Cookery or Mr. Wellman/Mr. Collier.
Cookery was a duly formed corporation pursuant to Louisiana law. A corporation, as a juridical person, is separate and distinct from its members or its shareholders. La.C.C. art 24; Riggins v. Dixie Shoring Co., Inc., 590 So.2d 1164, 1167 (La.1991). Corporations have the power to act in furtherance of their purpose, can sue and be sued, and have the power to enter into contracts. LSA-R.S. 12:41.
Cookery had been a tenant of the FMC for more than twenty years when Mr. Wellman/Mr. Collier began their negotiations with Mr. Tufail. For all of these years, Cookery had operated a business out of the leased premises at 812 Decatur Street in the French Quarter pursuant to two successive leases. Both leases prohibited the assignment of the lease without the FMC’s approval. The original lease between Cookery and the FMC (the 1977 lease), however, included a specific provision for corporate tenants. That lease provided that if a corporate tenant transferred the majority of its stock in one transaction, the transaction would be considered an assignment of the lease and would require the approval of the FMC. Significantly, this provision was not included in the 1997 lease between the parties.
The 1977 lease provision stated, in pertinent part:
Tenant shall not assign this lease or any interest therein, nor sublease the leased premises ... without the prior written consent of the landlord.... In the case of a corporate Tenant, any transfer of this Lease by merger, consolidation, or liquidation and any change in the ownership of, or power to vote, the majority of its outstanding stock, occurring in a single transaction, shall constitute an assignment for the purposes of this paragraph. Assignment or sublease shall also be subject to confirmation of the City Council.
The above-cited italicized language was deleted from the 1997 lease. The 1997 lease reads, in pertinent part:
The Tenant shall not assign, transfer, sublease, pledge, hypothecate, surrender or otherwise encumber or dispose of this lease or estate created by this lease, or any interest in any portion of the same, or permit any other person or persons, company or corporation to occupy the premises.
[19The plain words of the 1977 lease provided that any change in ownership of the majority of the stock of Cookery accomplished by a single transaction would constitute an assignment, which would be subject to confirmation by the City Council. Therefore, absent such confirmation, the sale of the corporate stock to Mr. Tufail, as provided for in the Management Agreement, would have been a violation of that lease.
The matter before us is governed by the 1997 lease. This lease prohibited the tenant from “assigning” or “transferring” the lease without the FMC’s approval. The Management Agreement did not do that. As Cookery was the tenant both before and after the sale of its stock to Mr. Tufail, Cookery neither assigned nor transferred the lease. Moreover, the record demonstrates that Mr. Tufail and his counsel, as well as Mr. Wellman/Mr. Collier and their counsel, were aware that the FMC might take the contrary position — that the 1997 lease did preclude the Management Agreement — because the FMC had so advised *62 Mr. TufaiFs initial counsel early on. Because all parties were aware of the FMC’s potential opposition, Mr. Tufail’s contention that his consent to the agreement is vitiated by error is meritless. Accordingly, we find no error in the cause of the contract sufficient to rescind the sale.
We conclude that the 1997 lease did not prohibit the sale of the stock of Cookery and did not require the approval of the FMC or the City Council, and further that Mr. TufaiFs default on the note and his decision to cancel the lease between Cookery and the FMC was a violation of the Management Agreement between him and Mr. Wellman/Mr. Collier. The trial court erred in finding otherwise.
|2oFor the foregoing reasons, we reverse the denial of Mr. Wellman/Mr. Collier’s motion for judgment on the promissory note and grant summary judgment in favor of them against Mr. Tufail for the balance of the note, plus legal interest from the date of judicial demand until paid. Further, we reverse the granting of partial summary judgment holding Mr. Wellman/Mr. Collier liable on Mr. TufaiFs reconventional demand and dismiss that demand, with prejudice.

Issue III: The May 21, 2012 Judgment

In light of our reversal of the partial summary judgment on liability, we also reverse the judgment rendered by the trial court awarding damages on the reconven-tional demand and order Mr. Tufail to return any amounts paid to him by Mr. Wellman and/or Mr. Collier in satisfaction of that judgment.

Issue IV: The Trial Court’s Refusal to Order Mr. Tufail to Pay Transfer Costs

Mr. Wellman/Mr. Collier contend that the trial court erred by refusing to order Mr. Tufail to pay for the costs assessed by the 24th Judicial District Court (“24th JDC”) to transfer the entire record to the Orleans Parish Civil District Court (“CDC”).
On January 19, 2012, the clerk of the 24th JDC notified Mr. Tufail that in order for the clerk to transfer the portion of the 24th JDC record missing from the CDC record, Mr. Tufail needed to pay $2,149.44 for copies of the trial exhibits in the transferred case. Mr. Tufail took the position that the parts of the record that had not been transferred were not necessary to the CDC action.
On April 2, 2012, the CDC judge granted Mr. Wellman/Mr. Collier’s ex parte motion to secure record when she ordered that “... Tufail take whatever |⅞1 steps are necessary to have the record in this case transferred from the Clerk of the 24th Judicial District Court to the Clerk of this court prior to trial.” Before taking any testimony in the trial on April 11, 2012, the trial court orally denied Mr. Wellman/Mr. Collier’s request to order Mr. Tufail to pay the costs to transfer the remaining records. Speaking to Mr. Wellman/Mr. Collier, the trial judge stated “I think that if you believe that information there is going to help your case, then I would pay for it and have it transferred over here. Otherwise I am not going to order them [Mr. Tufail] to pay for it.” Mr. Wellman/Mr. Collier now contend that the trial court erred in placing the burden on them to pay the outstanding balance due to transfer the portion of the record not originally transferred.
The burden is on Mr. Wellman/Mr. Collier to prove that the trial court erred in denying their motion. Mr. Wellman/Mr. Collier do not cite any law or offer any evidence in support of their argument, other than the notice from the 24th JDC to Mr. Tufail of the outstanding balance. As a court of record, we limit our review to that which is in the record on appeal before us. Tennessee v. Dep’t of Police, 2009-1461, p. 7 (La.App. 4 Cir. 2/24/10), 38 *63 So.3d 354, 358. Costs may be taxed by a rule to show cause and the court may render judgment for costs, or any part thereof, against any party as it may consider equitable. La. C.C.P. art. 1920. A trial court has great discretion in awarding costs and can only be reversed on appeal upon a showing of an abuse of that discretion. Watters v. Department of Social Services, 2008-0977, p. 49 (La.App. 4 Cir. 6/17/09), 15 So.3d 1128, 1162; Jeansonne v. Schmolke, 2009-1467 (La.App. 4 Cir. 5/19/10), 40 So.3d 347, 364. Mr. Well-man/Mr. Collier have failed to show that the trial court abused its discretion in its ruling, and therefore we decline to disturb the trial court’s ruling. Moreover, insofar as our disposition of this appeal makes the transfer of any further records from the 24th JDC unnecessary, this issue is moot.
DECREE
For the foregoing reasons, we reverse the trial court’s judgment of February 6, 2012, insofar as it denied the motion for summary judgment filed by Mr. Well-man/Mr. Collier and granted partial summary judgment in favor of Mr. Tufail on his reconventional demand. We further grant summary judgment in favor of Mr. Wellman/Mr. Collier and against Mr. Tu-fail on the promissory note and order that Mr. Tufail pay the balance due with legal interest until paid. Finally, we dismiss Mr. Tufail’s reconventional demand with prejudice and reverse the trial court’s judgment of May 21, 2012 that awarded damages on the reconventional demand.
REVERSED AND RENDERED.
LOVE, J., Dissents and Assigns Reasons.

. The FMC was, at various times, a party to this lawsuit. All issues as to the FMC have been resolved.

. Mr. Tufail also filed a motion to deposit his monthly installments into the court’s registry, but there is no evidence in the record that he ever made any deposits.

. The judgment also contained rulings on cross motions for partial summary judgment between Mr. Tufail and the FMC, which rulings are not pertinent to this appeal.

. The denial of a motion for summary judgment is an interlocutory judgment that is not appealable and may not be designated as final by the trial court. See La. C.C.P. arts. 968, 1915. Therefore, the trial court’s designation of the February 6, 2012 judgment as final was *57 proper only as to the granting of partial summary judgment in favor of Mr. Tufail, not as to the denial of Mr. Wellman/Mr. Collier’s motion for summary judgment. However, interlocutory judgments rendered during the course of an action become appealable once a final judgment has been rendered in the case. Because the trial court’s May 21, 2012 judgment is a final judgment, both of the challenged components of the trial court’s February 6, 2012 judgment are properly before us on appeal, as is the May 21, 2012 judgment on damages.

. As stated previously, Mr. Tufail submitted his September payment late, and it was returned to him.

. La. C.C. art. 1949 provides that consent may be vitiated by error, fraud or duress. There is no allegation that Mr. Tufail was under duress when he entered into this agreement.

.In the Amended and Restated Lease, the corporate name of Cookery N'Orleans Style, Ltd. was incorrectly listed as "Cookery N’Orleans Style and Karats.” Cookery N’Orleans Style and Karats was the name of the French Quarter store Cookery operated; it was not the legal name of the corporation. When the lease was renegotiated in 1997, two years before Mr. Wellman and Mr. Collier advertised for a new manager, the lease listed the *60 name of the corporate tenant as "Cookery N'Orleans Style and Karats,” which was not a corporate entity capable of entering into contracts. Mr. Tufail’s lawyer insisted that the name of the corporation be corrected in the lease as a condition precedent to the sale of the stock.
As required by the Management Agreement, Mr. Wellman and Mr. Collier took action to correct the legal name of the corporation in the lease. At their direction, counsel for Cookery sent a letter to the FMC explaining the error. The record contains this letter, an affidavit from Mr. Collier, the minutes of a meeting of the FMC which reflect approval of the name change, and an amendment to the lease to properly reflect the name of the corporate tenant, which amendment was executed in May of 1999. Once this correction was made, Mr. Wellman, Mr. Collier and Mr. Tu-fail proceeded with the sale of the stock.